**RECORD NO. 12-4847(L)**
**CONS. W/12-4862**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KEVIN STEVENS, JR.;
XAVIER HOLLEY,

*Defendants-Appellants.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT NORFOLK

———————————

**CONSOLIDATED OPENING BRIEF OF APPELLANTS**
**KEVIN STEVENS, JR. & XAVIER HOLLEY**

———————————

Emily M. Munn
Law Office of Emily Munn
B B&T Building, Suite 1540
500 East Main Street
Norfolk, VA 23510
(757) 440-3546
emily@emilymunnlaw.com

*Counsel for Appellant*
*Kevin Stevens, Jr.*

Andrew A. Protogyrou
Protogyrou & Rigney, P.L.C.
BB&T Building, Suite 1520
500 East Main Street
Norfolk, Virginia 23510
(757) 625-1775
protogyrou@prlaw.org

*Counsel for Appellant*
*Xavier Holley*

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................... iii

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF THE ISSUES........................................................2

STATEMENT OF THE CASE............................................................3

STATEMENT OF FACTS .................................................................5

SUMMARY OF ARGUMENT .........................................................16

ARGUMENT ...................................................................................18

I.      THE DISTRICT COURT COMMITTED PLAIN ERROR WHEN IT
        DENIED STEVENS AND HOLLEY'S MOTION TO DISMISS FOR
        LACK OF JURISDICTION PURSUANT TO THE HOBBS ACT ............18

        STANDARD OF REVIEW ........................................................18

        A.    ARGUMENT ON ISSUE I ................................................18

              INTERSTATE COMMERCE.........................................18

              LOPEZ ......................................................................21

              CONSTITUTIONAL DOUBT DOCTRINE.................26

              COUNTS THREE AND FIVE ......................................26

II.     THE DISTRICT COURT ERRED IN THE DENIAL OF HOLLEY'S
        MOTION TO DISMISS OR IN THE ALTERNATIVE TO
        SUPPRESS ON THE BASIS OF TRANSACTIONAL IMMUNITY ........27

        STANDARD OF REVIEW ........................................................27

A.    ARGUMENT ON ISSUE II ...................................................28

THROUGHOUT THE MONTHS LEADING UP TO THE APPELLANT'S INDICTMENT, AGENTS OF THE GOVERNMENT OFFERED THE APPELLANT AN INFORMAL GRANT OF TRANSACTIONAL IMMUNITY IN EXCHANGE FOR HIS COOPERATION AND SUCH PROMISE SHOULD BE ENFORCED ........................................30

A PROMISE THAT BESTOWS USE IMMUNITY BUT NOT DERIVATIVE USE IMMUNITY IS AN ILLUSORY PROMISE BECAUSE THE GOVERNMENT RETAINS AN UNLIMITED RIGHT TO CONTROL THE NATURE AND EXTENT OF ITS PROMISE TO HOLLEY ................................33

HOLLEY'S INCRIMINATING STATEMENT WERE INDUCED BY FALSE PROMISES OF IMMUNITY AND THEREFORE ARE INADMISSIBLE UNDER 18 U.S.C. § 3501 AND MUST BE SUPPRESSED .........................................35

III.    THE DISTRICT COURT ERRED IN CONVICTING STEVENS AND HOLLEY OF COUNTS ONE, TWOK, THREE, FOURT AND FIVE OF THE SECOND SUPERSEDING INDICTMENT AS THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THESE CONVICTIONS ..........................................................................37

STANDARD OF REVIEW ......................................................3

A.  ARGUMENT ON ISSUE III .................................................38

CONCLUSION ...................................................................40

REQUEST FOR ORAL ARGUMENT ...................................42

CERTIFICATE OF COMPLIANCE....................................42

CERTIFICATE OF SERVICE ...............................................43

# TABLE OF AUTHORITIES

## CASES

Brecht v. Abrahamson,
   507 U.S. 619 (1993) ...................................................................22

Elmore v. Cone Mills Corp.,
   23 F.3d 855 (4th Cir. S.C. 1994) ................................................33

Engle v. Isaac,
   456 U.S. 107 (1982) ...................................................................22

Evans v. U.S.,
   504 U.S. 255 (1992) ...................................................................20

Franks v. Delaware,
   438 U.S. 154 (1978) ...................................................................18

Glascock v. Commissioner,
   104 F.2d 475 (4th Cir. 1939) ......................................................33

Glasser v. United States,
   315 U.S. 60, 62 S. Ct. 457 (1942) ..............................................38

Grades v. Boles,
   398 F.2d 409 (4th Cir. W. Va. 1968)...........................................36

Gregory v. Ashcroft,
   501 U.S. 452, 111 S.Ct. 2395, 2400 (1991) ................................19

Hooters of Am. v. Phillips,
   39 F. Supp. 2d 582 (D.S.C. 1998) ...............................................33

Jackson v. Virginia,
   443 U.S. 307, 99 S.Ct. 2781, 2789 (1979) .............................37, 38

Kastigar v. United States,
   406 U.S. 441 (U.S. 1972) ............................................................29

NRLB v. Jones & Laughlin Steel,
    301 U.S. 1, 57 S.Ct. 615 (1937) ................................................................... 19

United States v. Bass,
    404 U.S. 336 (1971) ................................................................................... 22

United States v. Braxton,
    112 F.3d 777 (4th Cir. 1997) ...................................................................... 27

United States v. Brown,
    801 F.2d 352 (8th Cir. Ark. 1986) .............................................................. 32

United States v. Buffey,
    899 F.2d 1402 (4th Cir. 1990) .............................................................. 24, 25

United States v. Carpenter,
    611 F.Supp. (N.D. Ga. 1985) ......................................................... 28, 29, 34

United States v. Carter
    454 F.2d 426, (4th Cir. Va. 1972) .............................................................. 32

United States v. Collins,
    40 F.3d 95 (5th Cir. 1995) ............................................................. 25, 26, 27

United States v. Darby,
    312 U.S. 100, 61 S.Ct. 451 (1941) ............................................................. 19

United States v. Flores,
    855 F. Supp. 638 (S.D.N.Y. 1994) ............................................................ 25

United States v. Gonzalez,
    736 F.2d 981 (4th Cir. Va. 1984) ........................................................ 29, 35

United States v. Gray,
    137 F.3d 765, 772 (4th Cir.)(1998) ........................................................... 38

United States v. Johnson,
    114 F.3d 435 (4th Cir. 1997) ...................................................................... 27

United States v. Jones,
    356 F.3d 529 (4th Cir. 2004) ..........................................................28

United States v. Lopez,
    514 U.S. 549, 115 S.Ct. 1624 (1995) .......................................21, 22

United States v. McFarland,
    311 F.3d 376 (5th Cir. 2002) ........................................................21

United States v. McHan,
    101 F.3d 1027 (4th Cir. 1996)..................................................27, 30

United States v. McHan,
    101 F.3d 1027 (4th Cir. 1996)..................................................27, 30

United States v. Perrotta,
    313 F.3d 33 (2d Cir. 2002) ...........................................................25

United States v. Photogrammetric Data Serv.,
    259 F.3d 229, 237 (4th Cir. 2001) ................................................18

United States v. Plummer,
    941 F.2d 799 (9th Cir. Ariz. 1991) ...............................................30

United States v. Quigley,
    53 F.3d 909 (8th Cir. 1995) ..........................................................25

United States v. Romer,
    148 F.3d 359, 364 (4th Cir. 1998) ................................................38

United States v. Rusher,
    966 F.2d 868 (4th Cir. 1992) ........................................................28

United States v. Seidman,
    156 F.3d 542 (4 Cir. 1998) ...........................................................28

United States v. Simons,
    206 F.3d 392 (4th Cir. 2000) ........................................................27

United States v. Villarini,
        238 F.3d 530 (4th Cir. 2001) ........................................................... 38

United States v. Wang,
        222 F.3d 234 (6th Cir. 2000) ....................................................... 25

## STATUTES

28 U.S.C. § 1291 .................................................................................. 1

18 USC § 1951 ...........................................................................2, 3, 20

18 U.S.C. 924(c)(1) ........................................................................... 26

18 U.S.C. 924(c)(1)(A) .....................................................................3, 26

18 U.S.C. 924(j)(1) ..........................................................................3, 26

18 U.S.C. 924(2) ...............................................................................3, 26

18 U.S.C. § 3501 .......................................................17, 27, 29, 35

18 U.S.C. § 3501(b) .......................................................................... 36

18 U.S.C. § 6001 et. seq. .................................................................. 27

## CONSTITUTION

Const. Amend. 5 .................................................................................. 28

Const. Amend. 10 ................................................................................ 19

## OTHER AUTHORITIES

S. Rep. 532, 73rd Cong., 2nd Sess. (1934) .........................................20

91 Cong. Rec. 11843 (1945) ...............................................................20

91 Cong. Rec. 11900 (1945) ...........................................................20, 21

# JURISDICTIONAL STATEMENT

This case originated in the United States District Court for the Eastern District of Virginia, Norfolk Division ("the District Court").  After a jury trial that concluded on July 13, 2012, the Appellants, Xavier Holley and Kevin Stevens Jr., (hereinafter, "Holley" and "Stevens" or "Appellants" collectively), were found guilty of five felony offenses. After a sentencing hearing conducted on October 23, 2012, the District Court entered an Order of Judgment on October 24, 2012, convicting Holley and Stevens of the felonies and sentencing them for those offenses.

Holley and Stevens timely filed Notices of Appeal in the District Court on October 31, 2012 and October 24, 2012, respectively.  This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## **STATEMENT OF THE ISSUES**

I.      The District Court erred in finding that Federal Subject Matter jurisdiction exists under The Hobbs Act, 18 USC § 1951, in this matter.

II.     The District Court erred in the denial of the Motion to Dismiss or in the alternative to suppress statements of Appellant Holley and any and all evidence derived, directly or indirectly from information provided to the government or its agents by Xavier Holley, on the basis of transactional immunity.

III.    The District Court erred in convicting Holley of Counts One, Two, Three, Four, and Five of the Second Superseding Indictment as the evidence was insufficient to support those convictions.

2

## STATEMENT OF THE CASE

Holley and Stevens were charged under the five-count superseding indictment dated December 19, 2011 with the crimes of conspiracy to interfere with commerce by robbery 18 U.S.C. 1951, attempt to interfere with commerce by robbery 18 U.S.C. 1951, use and carry of a firearm during and in relation to a crime of violence 18 U.S.C. 924(c)(1)(A), and use and carry of a firearm during and in relation to a crime of violence causing death 18 U.S.C. 924(c)(1)(A), (j)(1), and (2). Each count of the indictment relates to a three-day period of October 4-6, 2010 when Holley, Stevens, and other co-defendants and individuals allegedly conspired to rob the Gold Shop in Portsmouth, Virginia, which led to the death of employee Robert Nelson.

In a pre-trial motions hearing, held on February 27, 2012, the District Court heard the Holley's motions to dismiss the indictment and suppress the evidence on the basis of transactional immunity. Furthermore, Stevens asserted a motion to dismiss for lack of subject matter jurisdiction in which Holley joined. The defense motions for dismissal based upon lack of jurisdiction were denied, as was Holley's motion to dismiss or suppress based upon transactional immunity.

Trial in the United States District Court for the Eastern District of Virginia, Norfolk Division began on July 10, 2012 and the Government rested its case on July 12, 2012. The defense rested its case on the same day without calling any witnesses. After the presentation of motions at the close of evidence on July 12, 2012 and final arguments of counsel on July 13, 2012, the jury began its deliberations.

The jury returned its verdict on July 13, 2012. Holley and Stevens were found guilty of all five counts with which they were charged.

On October 23, 2012, the District Court conducted a sentencing hearing. The District Court sentenced the Holley as follows: on Count One, 240 months; on Count Two, 240 months; on Count Four 240 months, all to run currently; on Count Three, 60 months to run consecutively with Counts One, Two, and Four; and on Count Five, a life term to run consecutively with the other sentences.

The District Court also imposed a special assessment of one hundred dollars ($100.00) for each count of conviction, thus equaling a five hundred dollar ($500.00) assessment. The District Court entered an Order of Judgment on October 24, 2012.

Holley and Stevens filed Notices of Appeal in the District Court on October 31, 2012 and October 24, 2012, respectively.

4

## <u>STATEMENT OF THE FACTS</u>

This case involves the shooting death of an employee of the Gold Shop of Portsmouth, VA, Mr. Robert Nelson on October 6, 2010. At trial, the Government presented the testimony of multiple witnesses who were working adjacent to the Gold Shop on October 6, 2010 and who observed the premises after the incident, saw Mr. Nelson lying on the floor of the shop and called emergency personnel to the scene.

Mr. George Winchell, a superintendent for construction for the Virginia Civil Corporation who was working at a construction site near the Gold Shop testified he saw two young men in hooded sweatshirts travel, on foot, in the direction of the Gold Shop and then later heard a commotion coming from the strip mall in which the Gold Shop is located (JA 228). Mr. Winchell testified he approached the shop the door had been damaged, and upon entering the shop he saw a man was lying, unmoving, on the ground (JA 233). Upon checking for a pulse and finding none, Mr. Winchell left the premises and did not see anyone else go in before the police arrived (JA 234).

The Government also presented the testimony of emergency personnel who responded to the 911 calls to the Gold Shop on the date of the incident. Mr. Michael Foote, a master firefighter/ paramedic with the City of

5

Portsmouth was the first responder to reach the scene. Mr. Foote testified the door appeared to be damaged and that the victim inside was clearly deceased (JA 304). Further, the victim had a small blunt object in his hand, classified as a jeweler's anvil (JA 305). Ms. Melissa Michalski, a member of the Portsmouth Police Department Forensic Services Unit, performed an investigation of the scene and took photographs. Ms. Michalski discovered a bullet cartridge casing as well as a black bag next to the victim containing a handgun (JA 317).

Dr. Jeffrey Gofton, an assistant chief medical examiner for the Tidewater office, performed the autopsy of Mr. Nelson and testified at trial that the cause of death was a single gunshot wound to the upper left chest (JA 355). Dr. Gofton also testified that the bullet was recovered from the victim's body during the autopsy (JA 356). Further, Dr. Gofton testified that the victim had not sustained any wounds he would categorize as defensive wounds indicating a physical altercation prior to sustaining the gunshot (JA 360).

Mr. Glenn Perry, uncle of the Holley who works at the Portsmouth Commonwealth Attorney's Office, testified following the incident Holley called him and informed him it was his firearm that had been used in the shooting (JA 366). Mr. Perry later reported this conversation to his superiors

6

at the Commonwealth Attorney's Office and Detective Mark Luck of the Portsmouth Police Department (Ja 368).

Detective Mark Luck of the Portsmouth Police Department's Homicide and Robbery Unit testified he was assigned as the lead investigator of the Gold Shop incident (JA 417). Detective Luck also indicated on October 6, 2010, while investigating the scene, he discovered the existence of a surveillance camera facing toward the Gold Shop from an adjacent business (JA 419). Upon review, this surveillance camera appeared to show on October 5, 2010 three individuals walked up to the Gold Shop, stood outside, and then walked away (JA 422). Neither of these individuals has been identified as Holley.

On October 6, 2010, this camera recorded two similar looking individuals, who Detective Luck testified to be Montarius Murry and Kevin Stevens Jr., open the door to the Gold Shop, enter for approximately twelve seconds, before they leave (JA 425). The individual Detective Luck believes to be Stevens appeared, according to him, to be wearing a black glove in the video and hiding his right hand in his sleeve (JA 426). Detective Luck indicated informant tips were received, implicating Stevens, Mr. Murry, Keith Wright, and Raneisha Sifford (JA 431-432).

Stevens was taken into custody on November 4, 2010, was interviewed by Detective Luck, and indicted by a grand jury on November 5 (JA 437-438). At the November 4 interview, Detective Luck testified Stevens admitted he, Mr. Murry, and Mr. Wright went to the Gold Shop on October 5, 2010 (JA 439). Detective Luck further indicated during the November 4 interview, Mr. Stevens stated he and Mr. Murry returned to the Gold Shop on October 6, but the door was already open and Mr. Nelson was already dead (JA 445).

Detective Luck also testified that based upon informant tips Holley was also connected to the incident (JA 455). On November 10, 2010, a non-custodial interview was conducted at the Portsmouth Detective Bureau (JA 455-456). During this interview, according to Detective Luck, Holley was told the police had information it was his firearm used in the October 6 shooting, but they did not wish to charge him, Holley, in connection with the crime (JA 467). In fact, in three separate instances, Holley was told by the officers that he would not be charged in connection with the robbery, and that officers would believe him if he told them that he provided the firearm but did not know about the intended use (JA 149).

During this interview, Holley was asked about his association with the "Big Money Boys" (BMB) (JA 469). Holley was known to have a tattoo of

"BMB" on the left top of his hand (JA 469). Holley did not provide any substantive information concerning the incident on October 6 during this interview with Detective Luck. During cross-examination, Detective Luck testified despite the Gold Shop being located at a strip mall with numerous other businesses, the gunshot that killed Mr. Nelson in the early afternoon of October 6 was not heard or reported by anyone (JA 480). Furthermore, officers contacted Holley multiple times via cell phone and also had contact with Holley's family in reference to this matter (JA 166).

On cross-examination, Detective Luck testified on the March 3, 2011 interview between the US Attorney's Office, the FBI, Holley, and he a proffer letter was offered to Holley (JA 486). During the March interview, Detective Luck indicated Holley maintained he did not have knowledge of the incident, but the firearm used had been provided by him and he had been in the front passenger seat of the car with Mr. Ronald Gober, Mr. Murry, and Stevens both before and after Stevens and Mr. Murry left the vehicle with Holley's firearm (JA 487). Further, Detective Luck testified during the March 3 interview, Holley indicated following the incident he had disposed of the firearm down a sewer drain (JA 492). According to Detective Luck, following this interview, Holley took federal and state authorities to the site where he disposed of the firearm (JA 492).

9

Mr. Wendell Cosenza, an agent for the Federal Bureau of Investigation's Norfolk field office, testified concerning the Federal investigation, which began in February of 2011 (JA 708). Agent Cosenza indicated he is aware of an interview in the fall of 2010 wherein Holley denied involvement in the Gold Shop robbery and also his cell phone was inoperative at the time of the robbery (JA 708). Agent Cosenza testified he found the information offered at this fall 2010 interview to be inconsistent with cell phone records in the custody of law enforcement for Holley's cell phone at the time of the Gold Shop robbery (JA 709).

Agent Cosenza also testified he was present for the interview on February 27, 2011 with Holley in order to encourage Holley to provide information about the robbery (JA 709). Further, Agent Cosenza indicated that he was present during the March 3, 2011 meeting between Holley and federal law enforcement in which a proffer letter, offering protections in exchange for information was given to Holley. The terms of the letter indicated that no charges would be made against Holley stemming from information he provided, conditioned upon Holley's full cooperation with the investigation (JA 711).

Agent Cosenza indicated Holley accepted the agreement and then proceeded to inform him and other law enforcement that he became aware of

10

the robbery when someone called him after the Gold Shop had been robbed, though he admitted to riding with Montarius Murry and Ronald Gober and providing a gun to Montarius Murry (JA 712-713). Holley then took law enforcement to the storm drain where he had disposed of the firearm after October 6, but law enforcement officers were unable to recover the firearm (JA 715).

Montarius Murry testified pursuant to his plea agreement against the Appellants. Mr. Murry received forty-three years for conspiracy to commit business robbery and the use of a firearm during a crime of violence resulting in death (JA 497). Mr. Murry indicated he frequented the Gold Shop of Portsmouth often to sell property he had taken during the multiple burglaries he had perpetrated in the past (JA 501-502). Mr. Murry stated he made the decision, masterminding the robbery of the Gold Shop on October 4, 2010 with Stevens (JA 503).

Mr. Murry testified he had noticed the presence of a firearm in the Gold Shop in the past and decided to call Holley in order to procure a handgun for the robbery (JA 504). According to Mr. Murry, on October 4, Holley provided a black handgun to him after a series of text messages in which Mr. Murry told Holley he needed a handgun for a "sting" or "lick" (JA 507). Mr. Murry indicated the plan was to rob the Gold Shop on October

11

5 and on that date, he, Stevens and Keith Wright were driven by Raneisha Sifford in her white Honda to the Gold Shop (JA 516).

Once at the Gold Shop, Stevens, Mr. Murry, and Mr. Wright left the vehicle, proceeded to the Gold Shop, but returned to the vehicle without going through with the robbery (JA 518). Mr. Murry indicated the robbery was not perpetrated at that time because Mr. Wright and Stevens, who allegedly had Holley's handgun, "got scared" and decided against going forward (JA 518).

The following day, Mr. Murry and Stevens decided to attempt the Gold Shop robbery again (JA 519). Mr. Murry indicated Holley was expecting the return of his handgun on October 6 and Mr. Murry told him, via text message, in exchange for a period of additional use, Holley would be paid from proceeds of the robbery (JA 519). Mr. Murry and Stevens then met Holley and Ronald Gober, who was to be their driver, before going to the Gold Shop (JA 533).

En route to the Gold Shop, Mr. Murry testified the four of them discussed how the robbery would take place (JA 535). When they arrived at the Gold Shop, Stevens took Holley's handgun from the bag and Mr. Murry and Stevens went into the Gold Shop (JA 537). Once there, Mr. Murry testified Stevens pointed the handgun at a man behind the counter while Mr.

12

Murry went to the rear office to retrieve the money, at which point he heard a gunshot (JA 537). After the gunshot, both Mr. Murry and Stevens allegedly fled back to the vehicle (JA 538). During the car ride following the incident, Mr. Murry indicated Stevens said "I messed up". Mr. Murry testified that following the incident, the handgun was given back to Holley with instructions to get rid of it (JA 542). Following the incident, Mr. Murry testified to seeing the shooting on the news and leaving for Maryland with Stevens for a few weeks (JA 542).

Keith Wright also testified for the government, in his case in hope the charges against him in connection with this matter would be brought in juvenile state court rather than federal court (JA 584). Mr. Wright was in custody for unrelated burglary charges at the time of his testimony (JA 584). Mr. Wright testified that on October 5 he met with Mr. Murry and Stevens and went to the Gold Shop in possession of a black handgun in order to commit a robbery (JA 589). When the robbery did not occur he, Mr. Murry, and Stevens returned to the car with Ms. Sifford, where Stevens indicated that he had become scared (JA 592).

Raneisha Sifford testified pursuant to her plea agreement for charges related to the attempted robbery of the Gold Shop on October 5, for which she received five years in prison (JA 602). Ms. Sifford testified to having

13

met Mr. Murry, Stevens, and Mr. Wright on October 5, 2010 before taking them to the Gold Shop in Portsmouth to commit a robbery (JA 608-609). Ms. Sifford also testified that Mr. Murry told Stevens to "pop [the Gold Shop employee] in the knee", but did not see a weapon on anyone in the vehicle (JA 611).

Ms. Sifford also testified to Mr. Murry and Stevens borrowing her vehicle on October 6 after staying the night at her residence, but that she was unaware of the October 6 robbery plan at the time (JA 617). Later that night, Mr. Murry confided in Ms. Sifford that a man had been killed by Stevens at the Gold Shop (JA 619).

Ms. Sifford testified to having lied to the police in October of 2010 and also to the Grand Jury in May 2011, but attests to the truthful nature of her trial testimony (JA 621, 625).

Ronald Gober II also testified pursuant to a plea agreement to charges connected with the October 6 Gold Shop robbery, for which he received a twenty-five year prison term (JA 633).

Mr. Gober indicated on the morning of October 6, 2010, he awoke at his residence, which he shares with his sister, and found his sister, Mr. Murry, and the Appellants present at the house (JA 639). Mr. Gober also

states he sent text messages to Holley on the morning of October 6, which is corroborated by phone records (JA 677).

Mr. Gober indicated Mr. Murry, the Appellants, and he went to another room and discussed plans for a robbery (JA 640). Mr. Gober indicated that he was asked to be the driver for the October 6 robbery and that Holley's role had been providing the handgun (JA 643).

Mr. Gober testified to Stevens taking the handgun upon their arrival at the Gold Shop and placing it in his waistband (JA 652). Mr. Gober testified that the handgun taken by Stevens was chrome with black handles but he had previously testified to the weapon only being chrome or silver (JA 664). Mr. Murry indicated to Mr. Gober he was to keep the vehicle running and the Holley was to open the rear doors for Mr. Murry and Stevens when they emerged from the direction of the Gold Shop (JA 652).

After Mr. Murry and Stevens had returned to the vehicle Mr. Gober drove them from the area (JA 656). Later that evening, Mr. Gober testified to having witnessed a conversation between Mr. Murry and Stevens, wherein Mr. Murry indicated that Stevens had shot an individual inside the Gold Shop (JA 659).

Mr. Gober also testified to Holley coming to him on the night of October 6 and telling Mr. Gober to drive him to a place where he could

dispose of the firearm (JA 660). The two men then proceeded to Brighton, in Portsmouth, where Holley deposited the handgun in a storm drain (JA 661).

Mr. Gober testified to having been involved in bringing Stevens and Mr. Murry from back to the Tidewater area from Maryland a few weeks after the Gold Shop incident (JA 662).

Mr. Gober testified at trial that he had previously been untruthful during police interviews, in a letter to the court, and also during testimony before the grand jury in this matter (JA 665). Mr. Gober also testified that he was using marijuana daily and heavily during the period of the Gold Shop incident, though he denies any impact on his memory or judgment (JA 666, 673).

## **SUMMARY OF THE ARGUMENT**

Appellants contend that the District Court lacked jurisdiction under the Hobbs Act to hear the charges against them. The legislative history of the Hobbs Act demonstrates that its intent was to enable the federal government to better combat the activities of organized crime, which at the time, was directly obstructing interstate commerce. This interpretation of the Hobbs Act is supported by subsequent case law. The facts and circumstances of the instant case involve the robbery of a local pawn shop, an act which has no impact on interstate commerce. Therefore, the conduct

does not fall within the scope of the Hobbs Act and should have been prosecuted in state court.

Holley asserts that the conviction against him related to this matter should have been dismissed or evidence against him be suppressed on the basis of transactional immunity. Throughout the months leading up to the Holley's indictment, agents of the government offered Holley an informal grant of transactional immunity in exchange for his cooperation and such a promise should be enforced. Further, the fact that the agreement for immunity was not honored, despite the voluntary conveyance of evidence in reliance of this promise by Holley, shows inducement by false promises and are therefore inadmissible under 18 U.S.C. § 3501.

Holley also asserts the conviction against him should be dismissed because the conviction was based upon insufficient evidence. The government's claims against Holley are based in large part upon the contradictory, impeached, and inherently unreliable testimony of incarcerated co conspirators, all of whom are hoping to receive lenient treatment in exchange for their testimony. In one particular case, a witness against Holley testified to lying under oath three times, including before a grand jury for this case. Evidence from such sources would not be able to

sway the mind of a reasonably prudent fact finder and convictions contrary
to this should be overturned.

## ARGUMENT

I. **THE DISTRICT COURT COMMITTED PLAIN ERROR WHEN IT DENIED STEVENS' AND HOLLEY'S MOTION TO DISMISS FOR LACK OF JURISDICTION PURSUANT TO THE HOBBS ACT.**

## STANDARD OF REVIEW

In reviewing a district court's decision to deny a request for an
evidentiary hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), an
appellate court "review[s] the district court's factual findings for clear error,
and its legal conclusions de novo."  United States v. Photogrammetric Data
Serv., 259 F.3d 229, 237 (4th Cir. 2001) (citation omitted).

### A. Argument on Issue I

The District Court erred in denying Stevens' and Holley's motion to
dismiss for lack of jurisdiction.  The United States exceeded federal
authority by bringing federal charges against Stevens and Holley given
settled history and caselaw supporting the reservation of crimes such as
these for prosecution in the state courts.

## INTERSTATE COMMERCE

The founding fathers drafted a Constitution which granted limited

enumerated powers to the federal government. See U.S. Constitution, Article I, Section 8. The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Constitution, Amendment 10. This division of authority with significant limitations on the federal government's power was crafted deliberately and after much debate by the framers of the Constitution. "Just as the separation and independence of the coordinate Branches of the Federal Government serves to prevent the accumulation of excessive power in any one Branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." Gregory v. Ashcroft, 501 U.S. 452, 458, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991).

One of the specifically enumerated powers of the federal government is to regulate commerce between the states. This power is set forth in the Commerce Clause. See U.S. Constitution, Article I, Section 8, clause 3. Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce. See NRLB v. Jones & Laughlin Steel, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). Following the handful of cases that defended Congress' authority to enact various

19

provisions governing interstate commerce, Congress sought to expand and

As a further definition of its power over interstate activity, Congress amended the Anti-Racketeering Act of 1937 by passing the Hobbs Act, Title 18, United States Code, Section 1951.  The act provides, in relevant part, as follows:  "Whoever in any way obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to do so ... shall be fined under this title or imprisoned not more than twenty years, or both."  Id.  The legislative history for the Act indicates that the amendment aimed to allow the federal government to effectively prosecute interstate criminal acts of gangsters.  See 91 Cong. Rec. 11843 (1945); see also Evans v. U.S., 504 U.S. 255, 261 (1992).  The Senate Report on S. 2248, which (as amended) became the 1934 Act, reads that "the nearest approach to prosecution of racketeers as such has been under the Sherman Antitrust Act" but such prosecutions have been hampered by the requirement of proving conspiracy or monopoly and by being merely a misdemeanor, and that the proposed bill "is designed to avoid many of the embarrassing limitations ... of the Sherman Act, and to extend Federal jurisdiction over all restraints of any commerce within the scope of the Federal Government's constitutional powers." S. Rep. 532, 73rd Cong., 2nd Sess. (1934). While acknowledging that this federal interference

with traditional common-law state crimes, the Act was justified by the frequent crossing of state lines done by gangsters and criminal organizations.

What the legislative history of the Hobbs Act indicates is an effort to control multi-state racketeering organized crime activity and interstate labor disruption, <u>not</u> robberies of local businesses.  In fact, one committee member noted that "this bill is designed simply to prevent both union members and nonunion people from making use of robbery and extortion under the guise of obtaining wages in the obstruction of interstate commerce. That is all it does...." (Rep. Hancock); 91 Cong. Rec. 11900 (1945).  <u>See also</u> <u>United States v. McFarland</u>, 311 F.3d 376, 387 (5th Cir. 2002) (en banc) (analyzing the Act's legislative history and concluding "[t]his legislative history strongly suggests to us that Congress in enacting the Hobbs Act was concerned with protecting against relatively direct obstruction of the actual movement of goods in interstate commerce, and did not contemplate its application to robberies of local retail stores").

<u>LOPEZ</u>

In 1995, the Supreme Court put significant brakes on the government's commerce clause power through its decision in <u>United States v. Lopez</u>, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).  In <u>Lopez</u>, the court struck down the Gun-Free School Zones Act of 1990 as

21

unconstitutional because it was beyond Congress' commerce clause power. The court recited a history of court involvement in federal commerce clause power, holding that "where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." Id. at 562. In contrast, however, the Court further explained that where a statute "define[s] as a federal crime conduct readily denounced as criminal by the States", fundamental principles of federalism require that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance" by federalizing local crimes. Id. at 562, quoting United States v. Bass, 404 U.S. 336, 349 (1971).

The concerns set forth by the Lopez court about the federal reaches into matters traditionally charged and brought forth in state court certainly apply to the instant case and the Hobbs Act. As the Supreme Court has clearly warned, "[u]nder [the American] federal system, the "States possess primary authority for defining and enforcing the criminal law." Lopez, 514 U.S. at 561 n.3 (quoting Brecht v. Abrahamson, 507 U.S. 619, 635 (1993), and Engle v. Isaac, 456 U.S. 107, 128 (1982)). Congress did convey its purpose clearly in the language of, and the legislative discussion preceding the passing of, the Hobbs Act. That purpose was to prevent gangsters and racketeering operations from frustrating justice when their activities took

place in multiple states. The Act, nor the discussion, indicate that Congress clearly intended for the federal government to become involved in garden-variety state crimes such as the one with which Defendant is charged.

One significant difference between The Gun-Free School Zones Act of 1990 and the Hobbs Act is that, unlike the former, the Hobbs Act does contain a specific jurisdictional element which must be proven before an individual can be convicted. The Hobbs Act requires the government to prove that one "affects, obstructs, or delays" interstate commerce during the course of a specific crime. However, courts have spent a significant amount of time deliberating about what precisely is enough contact with interstate commerce to satisfy this element. "Substantially" is a key word used repeatedly by the <u>Lopez</u> court, and that should be the standard applied by this court in determining whether the facts in the case at bar rise to the level required by the Hobbs Act when interpreted through the lens of <u>Lopez.</u>

The facts in the case at bar as set forth in the indictment are that Appellants and co-Defendants, conspired to rob and then attempted to rob a local pawn shop. There is no indication that the shop operates in multiple states, nor any indication that interstate commerce was affected in any way by virtue of the attempted robbery. No property or funds were alleged to have been taken, and there is no allegation that the victim in the case was

23

operating in interstate commerce nor that his death had any effect on interstate commerce. Although the alleged crimes happened to occur on commercial property, the only crime that was carried out was one against an individual.

The Fourth Circuit has made clear that on the spectrum of cases that may not be federally prosecuted based on allegations of interstate commerce effects, crimes against individuals are not properly brought under Hobbs Act theory. The jurisdictional element, when taken together with the significant history of this issue as mentioned above, is simply not satisfied. In United States v. Buffey, 899 F.2d 1402 (4th Cir. 1990), defendants were convicted of conspiracy to extort money from an individual in violation of the Hobbs Act. Id. at 1403. The government argued the Act's jurisdictional requirement was satisfied because there was a reasonable probability that the individual, who was the Chairman of the Board and majority stockholder of a company engaged in interstate commerce, would have depleted his company's assets to pay the would-be extortionists. Id. at 1404. The Fourth Circuit rejected this argument and reversed the defendants' convictions, holding that the government had failed to show "the defendants' actions were reasonably likely to have an effect on interstate commerce." Id. at 1406. The Fourth Circuit also held that "[e]xtorting money to be devoted to

24

personal use from an individual does not affect interstate commerce." Id. at 1406. While Buffey addressed the extortion provision of the Hobbs Act rather than the robbery provision, the jurisdictional concerns are the same. The fact that interstate commerce *may* have been affected, or that the Gold Shop *may* have had different profits or direction but for the alleged crimes, this conduct is more similar to an individual crime than it is to the far-reaching criminal enterprises contemplated by Congress in 1947 when it passed the legislation.

Other Courts have similarly refused to authorize criminal liability under the Hobbs Act when the alleged conduct is directed at individuals and the impact on interstate commerce is highly speculative. See, *e.g.,* United States v. Perrotta, 313 F.3d 33, 36 (2d Cir. 2002) (attempted extortion of employee of company operating in interstate commerce); United States v. Quigley, 53 F.3d 909, 910-11 (8th Cir. 1995) (robbery of patrons of liquor store on way to purchase alcohol); United States v. Collins, 40 F.3d 95, 101 (5th Cir. 1995) (robbery of employee of business engaged in interstate commerce); United States v. Flores, 855 F. Supp. 638, 642 (S.D.N.Y. 1994) (noting that "there exists almost no decisional law finding a violation of the Hobbs Act where the crime took place at a residence rather than at a business"); United States v. Wang, 222 F.3d 234, 240 (6th Cir. 2000).

## CONSTITUTIONAL DOUBT DOCTRINE

An additional argument in favor of strictly construing the Hobbs Act in cases where the effects, or possible effects, on interstate commerce appear to be minimal, is the doctrine of constitutional doubt.  In short, rather than risking constitutional criticism of the Hobbs Act, which the argument above confirms was deliberately passed with intentions of targeting criminal conduct which could not be adequately addressed by the states, the court should narrowly interpret the federal jurisdictional requirement to "save" the legislation from constitutional criticism.

## COUNTS THREE AND FIVE

The firearm charge alleged in the indictment was brought pursuant to Title 18, United States Code Sections 924(c)(1)(A)(i), (j)(1) and (2) as opposed to the Hobbs Act.  Whether the court has the authority to determine whether Appellants possessed a firearm in the course of certain crimes necessarily requires the court to have jurisdiction over those crimes.  Since the criminal conduct of the alleged conspiracy and attempted robbery was not properly charged in federal court, the firearm charges must also be dismissed for lack of jurisdiction.  40 F.3d at 101 "Section 924(c)(1) requires that the underlying offense be a federal crime and, as the robbery . . . conviction for violation of section 1951(a) is now voided, the conviction

26

for unlawful use of a firearm during that robbery also must be reversed.").

United States v. Collins, 40 F. 3d at 101.


## II.    THE DISTRICT COURT ERRED IN THE DENIAL OF HOLLEY'S MOTION TO DISMISS OR IN THE ALTERNATIVE TO SUPPRESS ON THE BASIS OF TRANSACTIONAL IMMUNITY.

### STANDARDS OF REVIEW

A district court' s finding as to whether the government has reached an agreement with the defendant not to prosecute him in exchange for his cooperation as per 18 U.S.C. § 6001 et. seq. is reviewed for clear error. See United States v. McHan, 101 F.3d 1027, 1034 (4th Cir. 1996), cert. denied, 520 U.S. 1281 (1997).

The federal standard of appellate review of the voluntariness of confessions as per 18 U.S.C. § 3501 is de novo. United States v. Braxton, 112 F.3d 777, 781 (4th Cir. 1997).

Review of a district court' s denial of a motion to suppress evidence involves a two-stage standard: Findings of historical fact only are reviewed for clear error. In reviewing a denial of a motion to suppress, we review the factual findings of the district court for clear error and its legal conclusions de novo. United States v. Johnson, 114 F.3d 435, 439 (4th Cir. 1997); United States v. Simons, 206 F.3d 392 (4th Cir. 2000). We review legal

conclusions involved in the district court' s suppression determination de novo but review factual findings underlying the legal conclusions subject to the clearly erroneous standard. United States v. Rusher, 966 F.2d 868, 873 (4th Cir. 1992). The legal conclusion in a district court' s decision on a motion to suppress are reviewed de novo and the factual findings are reviewed for clear error, and the evidence is viewed in the light most favorable to the prevailing party below. United States v. Seidman, 156 F.3d 542, 547 (4 Cir. 1998); United States v. Jones, 356 th F.3d 529, 532-33 (4th Cir. 2004).

## A. Argument on Issue II

The Fifth Amendment of the United States Constitution guarantees that no person "shall be compelled in a criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . ." USCS Const. Amend. 5.   Any evidence of guilt induced by a promise of immunity, even if such evidence was not compelled by court order, should be considered coerced testimony for purposes of the Fifth Amendment. United States v. Carpenter, 611 F.Supp. 768, 776 (N.D. Ga. 1985).  Thus, if a Defendant waives his constitutional right and is coerced to testify against himself, absent clear and convincing evidence to the contrary,

he should not be presumed to have done so for less than this his constitutional entitlement.  Id.

The government may confer two types of immunity upon a potential witness in order to induce him to testify, transactional or use.  While transactional immunity accords full immunity from prosecution for the offense to which the compelled testimony relates, use immunity as well as derivative use immunity prohibits the government from using the evidence in *any* respect, and it therefore ensures that the testimony cannot lead to the infliction of criminal penalties on the witness.  Kastigar v. United States, 406 U.S. 441, 453 (U.S. 1972) (emphasis in original).

Lastly, a defendant's confession or incriminating statement must be voluntary in order to be inadmissible pursuant to 18 U.S.C. § 3501 (2011).  If a defendant's confession is induced by false promises of immunity made by agents of the government, then such confession is involuntary and is therefore inadmissible.  See  United States v. Gonzalez, 736 F.2d 981, 982 (4th Cir. Va. 1984).

THROUGHOUT THE MONTHS LEADING UP TO THE APPELLANT'S INDICTMENT, AGENTS OF THE GOVERNMENT OFFERED THE APPELLANT AN INFORMAL GRANT OF TRANSACTIONAL IMMUNITY IN EXCHANGE FOR HIS COOPERATION AND SUCH PROMISE SHOULD BE ENFORCED.

Agreements to exchange cooperation for transactional immunity are governed by traditional principles of contract law, and, therefore, may be express or implied. While a contract is made when the parties verbally express their mutual assent to its essential terms, it may also be implied when the parties' conduct manifests their agreement. Further, under the concept of "equitable immunity" courts may enforce informal grants of transactional immunity where: (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement assisted with the investigation. United States v. McHan, 101 F.3d 1027, 1034 (4th Cir. 1996) (see also United States v. Plummer, 941 F.2d 799 (9th Cir. Ariz. 1991) (contract principles also apply to informal immunity agreements)).

The coercive conduct and statements of the Detectives throughout Fall 2010 and Winter 2011, are consistent with a grant of transactional or equitable immunity despite the illusory promise contained in the proffer letter. The Court should enforce the informal grant of transactional

30

immunity because an agreement was made, Holley performed, and the government is now prosecuting Holley for offenses related to the investigation in which he assisted.

Holley rightfully believed the government would not charge him in exchange for assisting the Detectives. This belief was well founded because the Detectives repeatedly told Holley that they would not charge him in the "Gold Shop incident" if he told them what he had done with the gun (JA 467, 711). On March 3, 2011, Holley met with Detectives and the United States Attorney and was given a proffer letter (JA 710). Prior to signing the proffer letter, Holley asked if it meant that the government would not charge him (JA 107). He was assured that the government would not charge him or use his statements against him as long as he told the truth (JA 106). Holley had consulted with attorney Richard Davis, but, being unable to afford legal fees, did not retain his legal services beyond consultation (JA 82). Believing that he would not be charged, Holley signed the proffer letter, gave a statement and showed the Detectives where he had disposed of the firearm (JA 107).

Holley should not be penalized because the transactional immunity offered repeatedly by the Detectives was at odds with the use immunity offered in the proffer letter drafted by the United States Attorney. When a

defendant acts in reliance upon a promise made by agents of the government that promise should be enforced.  As discussed by the Fourth Circuit Court of Appeals in <u>United States v. Carter</u>, there is more at stake than the liberty of one defendant, "at stake is the honor of the government public confidence in the fair administration of justice." 454 F.2d 426, 428 (4th Cir. Va. 1972).

Further, it is a factual question as to whether a defendant cooperated to the extent expected by the government and this issue shall not be determined unilaterally by the government.  <u>United States v. Brown</u>, 801 F.2d 352, 355 (8th Cir. Ark. 1986).  Instead, an evidentiary hearing must be held and the government has the burden of establishing a breach by the defendant if the agreement is to be considered unenforceable. <u>Id</u>.  In the current matter, though Holley did not initially cooperate with the investigation, he fully performed his part of the agreement by providing a truthful statement and showing the Detectives where he honestly believed he had disposed of the firearm (JA 107-108).  The proffer letter was not conditioned upon locating the firearm; it was conditioned upon Holley providing truthful information (JA 108).  Interestingly, Holley's statement is consistent with what the Detectives told Holley they would believe on November 11, 2010, he had provided the firearm for the robbery and he did not know what the other perpetrators planned to do with it (JA149).

32

Because Holley performed his part of the informal immunity agreement under the belief that he would not be charged in connection with the events of October 5 and 6, 2010, he should be granted equitable immunity and the indictments against him should be dismissed.

A PROMISE THAT BESTOWS USE IMMUNITY BUT NOT DERIVATIVE USE IMMUNITY IS AN ILLUSORY PROMISE BECAUSE THE GOVERNMENT RETAINS AN UNLIMITED RIGHT TO CONTROL THE NATURE AND EXTENT OF ITS PROMISE TO HOLLEY.

The government's promise of use immunity contained within the proffer letter is an illusory promise in light of the caveat that the government may use any derivative information against Holley. An illusory contract or promise makes performance optional for the promisor and is in fact no promise and is instead an unenforceable illusory contract. Elmore v. Cone Mills Corp., 23 F.3d 855, 870 (4th Cir. S.C. 1994). Further, a promise whereby the promisor retains an unlimited right to later decide the nature or extent of his performance is in law no promise. Hooters of Am. v. Phillips, 39 F. Supp. 2d 582, 617 (D.S.C. 1998) (citing Glascock v. Commissioner, 104 F.2d 475, 476 (4th Cir. 1939)).

Under this proffer letter, the government is in complete control of whether any statements or information provided by Holley will ever be used against him in a derivative nature during the government's case-in-chief.

The government is at liberty to take any statement of Holley, confirm its accuracy with a co-defendant or cooperating witness and present it at trial through those same witnesses as derivative information. Importantly, Holley's March 3, 2011 statement has already been used by the government. Co-defendants were informed of the subject matter of Holley's statement and of Holley's cooperation with government. One can easily assume that the government hopes this will force the co-defendants to plead guilty and testify against Holley in a manner consistent with his statement. Because the government as the promisor of use immunity had complete control over whether it would keep this promise, the proffer letter is an illusory contract and is unenforceable.

As stated above, any evidence of guilt induced by a promise of immunity should be considered coerced testimony for purposes of the Fifth Amendment. United States v. Carpenter, 611 F.Supp. at 776 (N.D. Ga. 1985). Thus, if a defendant waives his constitutional right and is coerced to testify against himself, absent clear and convincing evidence to the contrary, he should not be presumed to have done so for less than this his constitutional entitlement. Id.

In the current matter, Holley believed he waived his Fifth Amendment right in exchange for immunity from prosecution (JA 107). This belief was

based on the repeated offers of transactional immunity made by various government agents prior to March 3, 2011. However, on March 3, 2011, Holley performed his obligation under the agreement in exchange for the government's illusory promise. Therefore, because the proffer letter is an unenforceable illusory contract, Holley should be granted transactional immunity pursuant to the theory of equitable immunity. Frankly, the government was angry it could not find a weapon at the place Holley had taken them in search of the weapon and the pay back was an indictment.

HOLLEY'S INCRIMINATING STATEMENTS WERE INDUCED BY FALSE PROMISES OF IMMUNITY AND THEREFORE ARE INADMISSIBLE UNDER 18 U.S.C. § 3501 AND MUST BE SUPPRESSED.

Holley's incriminating statements and cooperation in locating the firearm were induced by repeated false promises of immunity and therefore the statements and any information derived there from must be suppressed. The Fourth Circuit Court of Appeals has recognized that a defendant's confession or incriminating statement must be voluntary in order to be inadmissible pursuant to 18 U.S.C. § 3501 (2011). If a defendant's confession is induced by false promises of immunity made by agents of the government, then such confession is involuntary and is therefore inadmissible. See United States v. Gonzalez, 736 F.2d 981, 982 (4th Cir. Va. 1984). Further, the defendant's subjective belief that a coercive promise

35

of immunity has been made is sufficient to establish that the induced confession was involuntary. See <u>Grades v. Boles</u>, 398 F.2d 409, 412 (4th Cir. W. Va. 1968).

In determining the voluntariness of a defendant's incriminating statements, the Court must look to all the surrounding circumstances leading to the confession and several factors are set out in 18 U.S.C. § 3501 (b). These factors include: whether the defendant knew the nature of the offense with which he was suspected; whether the defendant knew that he was not required to make any statement and that any statement could be used against him; whether the defendant was advised prior to questioning of his right to the assistance of counsel; and whether the defendant was without the assistance of counsel when questioned and when giving such confession. 18 U.S.C. § 3501 (b)(2011). Importantly, this list is not exhaustive and the absence of any one of these factors is not conclusive on the voluntariness of the confession.

In the current matter, Holley and his family were repeatedly contacted via telephone and in person by Detectives regarding Holley's alleged involvement in the robbery and shooting at the Gold Shop (JA 151). Further, Holley and his family met with detectives numerous times and during these meetings the Detectives made repeated offers of immunity if

Holley cooperated and gave them the firearm (JA 149). Following the interview of March 3, 2011, the Detectives were unable to locate the firearm and continued to contact Holley via text message to arrange a meeting and stated "Im trying to help keep u frm going to prison 4 the rest of ur life!" [sic].

In looking to all these circumstances, it is clear Holley believed he would not be charged with any crime in exchange for his cooperation. Because Holley's incriminating statements were induced by false promises of immunity, those statements were coerced and involuntary and must be suppressed.  Further, because Holley's statements were coerced in violation of his Fifth and Fourteenth Amendment rights, any information derived there from must also be suppressed.


**III.  THE DISTRICT COURT ERRED IN CONVICTING STEVENS AND HOLLEY OF COUNTS ONE, TWO, THREE, FOUR, AND FIVE OF THE SECOND SUPERCEDING INDUCTMENT AS THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THESE CONVICTIONS.**

### STANDARD OF REVIEW

The standard of review on direct appeal for sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443

U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) (emphasis in original). The standard for appellate review of the sufficiency of the evidence is that the verdict of guilt "must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457, 469, 86 L. Ed. 680 (1942); United States v. Gray, 137 F.3d 765, 772 (4th Cir.), cert. denied, 119 S. Ct. 157 (1998).

A district court's denial of a motion for a judgment of acquittal is reviewed de novo. United States v. Romer, 148 F.3d 359, 364 (4th Cir. 1998); United States v. Villarini, 238 F.3d 530 (4th Cir. 2001).

## A. Argument on Issue III

The evidence at trial was insufficient to show that Holley entered into any conspiracy nor knowingly provided a firearm as charged in counts one through five of the second superseding indictment.

Ronald Gober testified he had lied to the grand jury, lied to the police, lied to the District Court by letter, and stated unequivocally he would "do anything to bring down [his] sentence" (JA 682). Further, he was smoking marijuana incessantly during the time period of the crimes charged. Mr. Gober stated he awoke at his sister's home on the morning of October 6th and Holley was in the next room watching a movie. It was shown, beginning

in the early morning that Mr. Gober repeatedly tried to contact Holley (JA 676-677). Holley was at a hotel on Effingham Street in Portsmouth at that time and could not have been present with Mr. Gober as shown by cell phone tower contacts supported by the FBI Special Agent's testimony regarding same (JA 723). Mr. Gober also testified at trial Holley passed a black bag with a weapon to the backseat of the vehicle Mr. Gober was driving on October 6th, consistent with Holley's statement of providing the gun on said date (JA 651).

Raneisha Sifford testified she did not see a weapon on October 5th, consistent with Holley's statement of March 2011; he did not provide the weapon until October 6th (JA 611).

Keith Wright testified at trial he saw a black weapon on October 5th. All testimony, including Holley's March 2011 statement, was the weapon was chrome. Therefore, Holley did not participate in providing a weapon for the attempts of October 5th (JA 589).

Montarius Murry testified at trial he accepted a weapon at a motel on October 4th (JA 504). He was impeached with prior statements that the weapon was accepted at his grandmother's. On further cross-examination he did not remember where he had received the weapon.

Mr. Murry is known in the community as a thief, not a robber.

Therefore, it made sense that Holley would not think Mr. Murry would commit a robbery on October 6th. Further, Mr. Murry admitted to always parking in "the cut" when he was dispoing of stolen property. Therefore, again, Holley would not question Mr. Murry's motives with Stevens on October 6th when both exited the vehicle.

Holley has never admitted in any of his statements produced to the jury to joining any conspiracy.

## **CONCLUSION**

With respect to Issue I, Appellants respectfully request that this Honorable Court overrule the denial of the Motion to Dismiss for lack of subject matter jurisdiction and vacate their convictions imposed by the District Court and dismiss the case.

With respect to Issue II, Holley respectfully requests that this Honorable Court overrule the decision of the District Court to deny Holley's Motion to Dismiss on the basis of transactional immunity or in the alternative suppress evidence obtained through false government indictment, and remand the case to the District Court for such further proceedings as may be consistent with said ruling.

With respect to Issue III, Holley respectfully request that this Honorable Court vacate his conviction imposed by the District Court and dismiss the case.

Respectfully submitted this 3rd day of June, 2013.

**KEVIN STEVENS, JR.**

**By:_____/s/_____**

Emily M. Munn, Esquire
VA Bar No. 46390
Counsel for the Appellant
500 E. Main Street, Suite 1220
Norfolk, Virginia 23510
(757) 440-3546
Fax: (757) 440-3924
emily@emilymunnlaw.com

**XAVIER HOLLEY**

Andrew A. Protogyrou, Esquire
VA Bar No. 27253
Counsel for the Appellant
PROTOGYROU & RIGNEY, P.L.C.
500 East Main Street
BB&T Building, Suite 1520
Norfolk, Virginia 23510
(757) 625-1775
Fax: (757) 625-1887
protogyrou@prlaw.org

## <u>REQUEST FOR ORAL ARGUMENT</u>

Counsel for the Appellants respectfully request oral argument before this Honorable Court.

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief has been prepared using Microsoft Word software, Times New Roman 14 point font.

2. Exclusive of the table of contents, table of citations; statement with respect to oral argument; and the certificate of service, this brief contains 9,234 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

June 3, 2013

_____/s/_____

EMILY M. MUNN

42

## <u>FILING AND MAILING CERTIFICATE</u>

I hereby certify that on this 3rd day of June, 2013, I filed with the Clerk's Office of the United States Court of Appeals for the Fourth Circuit the required copies of the foregoing Opening Brief of Appellants and Joint Appendix via hand delivery and electronically using the Court's CM/ECF system which will send notification of such filing to:

>Benjamin L. Hatch
>V. Kathleen Dougherty
>Office of the U. S. Attorney
>8000 World Trade Center
>101 West Main Street
>Norfolk, VA 23510-1624
>v.kathleen.dougherty@usdoj.gov
>Benjamin.Hatch@usdoj.gov

>Counsel for Appellee

The necessary filing and mailing was performed in accordance with instructions given me by counsel in this case.

>/s/ May Serafim
>May Serafim
>Lantagne Legal Printing
>801 East Main Street, Suite 100
>Richmond, Virginia 23219-2472
>(804) 644-0477